**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| SANDRA L. HOLLAND, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 2:14-CV-88-PRC |
| | ) | |
| THE METHODIST HOSPITALS, | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

This matter is before the Court on Defendant's, the Methodist Hospitals, Inc., Motion for

Summary Judgment [DE 36], filed on October 8, 2015. Plaintiff Sandra L. Holland filed a response[1]

on January 21, 2016, and Defendant The Methodist Hospitals, Inc. filed a reply on February 25,

2016. With the Court's leave, each party filed a surreply on September 9, 2016. For the following

reasons, the Court grants in part and denies in part the motion.

**PROCEDURAL BACKGROUND**

After Plaintiff filed a charge with the Equal Employment Opportunity Commission (EEOC),

the EEOC issued a Dismissal and Notice of Rights on February 6, 2014, and Plaintiff initiated the

instant cause of action by filing a Complaint against Defendant on March 20, 2014. Defendant filed

an Answer on May 22, 2014. Defendant filed the instant Motion for Summary Judgment on October

8, 2015.

The parties pursued resolution of this matter via mediation on April 28, 2016, and via

settlement conference on July 6, 2016. The parties did not reach an agreement on either occasion.

---

[1]Though Plaintiff asserts in her response that she is entitled to summary judgment in her favor, Plaintiff has not
filed a motion for summary judgment, so that request is not properly before the Court.

Plaintiff alleges that Defendant has discriminated against Plaintiff in violation of the Family and Medical Leave Act (FMLA), Americans with Disabilities Act (ADA), and Title VII of the Civil Rights Act of 1964 ("Title VII"). As the Court will address below in Section E, it is unclear whether Plaintiff intends to bring a claim under the Health Insurance Portability and Accountability Act of 1996 (HIPAA).

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure require that a motion for summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Summary judgment is appropriate when no material fact is disputed and the moving parties are entitled to judgment as a matter of law, meaning that no reasonable jury could find for the other party based on the evidence in the record." *Carman v. Tinkes*, 762 F.3d 565, 566 (7th Cir. 2014).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that it believes

2

demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323; Fed. R. Civ. P. 56 (a), (c). The moving party may discharge its initial responsibility by simply "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325; *see also Spierer v. Rossman*, 798 F.3d 502, 508 (7th Cir. 2015). When the nonmoving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Celotex*, 477 U.S. at 323, 325; *Spierer*, 798 F.3d at 507-08; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168-69 (7th Cir. 2013).

"Once the moving party puts forth evidence showing the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). The non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. *See* Fed. R. Civ. P. 56(c)(1), (e); *Flint v. City of Belvidere*, 791 F.3d 764, 769 (7th Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e) (1986)). Rule 56(e) provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it . . . ." Fed. R. Civ. P. 56(e); *see also Anderson*, 477 U.S. at 248-50.

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *See Anderson*, 477 U.S. at 255; *McDowell v. Vill. of Lansing*, 763 F.3d 762, 764, 765 (7th Cir. 2014); *Srail v. Vill. of Lisle*, 588 F.3d 940, 948 (7th Cir. 2009). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *See Anderson*, 477 U.S. at 249-50.

## MATERIAL FACTS

Defendant hired Plaintiff in 2007 as a Patient Account Representative/Collector in its Central Business Office. The manager of the Central Business Office during Plaintiff's employment with Defendant was Yolanda Jaime, who is Puerto Rican. In January 2013, Plaintiff's supervisor was Marilyn Soto.

Plaintiff testified that, during her employment with Defendant, she received a copy of or read the following: (1) Defendant's Corrective Action System, which is a system of progressive discipline, (2) Defendant's Model of Care and Conduct, which includes a standard of behavior for Defendant's employees, (3) Defendant's Employee Relations Code, which sets forth a policy of and commitment to fair and equitable treatment of employees, and (4) Defendant's Leave of Absence policy, which explains types of leave available to Defendant's employees.

The Leave of Absence policy states that employees seeking FMLA leave must complete a request for leave with Defendant's third party administrator. Defendant hired third party administrator Matrix Absence Management ("Matrix") to manage Defendant's employees' leave under the FMLA.

Plaintiff testified that, at an FMLA meeting, Defendant approved a change to the duration of long-term FMLA certification from six months to one year. Plaintiff was certified for FMLA leave "lasting as needed, at a frequency of as needed" from June 7, 2012 to June 6, 2013. (Pl.'s Exh. I, at 5, ECF No. 44-9).

Plaintiff, at her deposition, testified that she took an extended period of time off under the FMLA in 2009 to have her pacemaker replaced and that she needed the pacemaker due to her heart blockage. She also testified to taking intermittent leave under the FMLA to attend doctors appointments and treatment appointments and when she was in excruciating pain.

Plaintiff was required to work 65 accounts per day. Jaime testified that the required 65 accounts per day quota was based on hours worked and that anything that took an employee away from performing her job, such as paid time off or being in a meeting, was considered downtime. Jaime later testified that "the calculation is you subtract the non-productivity hours . . . you're coming up with that average." (Pl.'s Exh. A, 145:19-21). Jaime also testified that it would be possible, if Plaintiff were taking too much time off, for her productivity numbers, as recorded on a spreadsheet, to be affected.

Plaintiff testified that, on multiple occasions, time that she had taken off as FMLA leave was not counted as downtime for the purpose of calculating her daily quota of accounts worked.

Regarding her medical issues, Plaintiff testified as follows. Her scoliosis causes pain, affects her sleeping habits, and, at times, makes it more difficult for her to take care of herself, shower, and dress herself. It also causes occasional arm numbness. Plaintiff starts having pain after driving a long distance. Walking is sometimes painful, but she is able to walk for approximately an hour, though foot problems also cause pain. Standing for too long is also painful. Plaintiff's back started hurting

5

after sitting for 2 hours and 45 minutes at her deposition. Plaintiff testified that her arthritis affects her daily activities in the same ways as her scoliosis. Plaintiff also testified that she has a heart blockage and is fully dependent on her pacemaker.

Plaintiff requested a different chair and the use of headphones as accommodations for her scoliosis and arthritis. Defendant made these accommodations.

A series of email messages were exchanged on October 26, 2012. The email chain begins with Soto asking how to go about giving Plaintiff four to twelve shift changes in November 2012 in light of the Central Business Office policy to only allow two shift changes per month. In a response, human resources employee Kimberly Smith advised Soto to give Plaintiff the shift changes. Jaime responded that she would like to tell Plaintiff that the department policy is to allow two shift changes and that other appointments would need to be scheduled during Plaintiff's lunch or after the work day. Jaime further indicated that she did not want to make exceptions for any one employee because Jaime has had problems with this before and that Plaintiff has "made a big issue of this." (Pl's Exh. II, at 2, ECF No. 44-33). Smith responded to Jaime, opining that Jaime's suggested solution would potentially violate the FMLA. Jaime then asked if approval for the therapy would go through Matrix, and Smith responded that it would. Soto then asked for a conference call on the matter. Soto also indicated that she believed she should tell Plaintiff that Defendant will give shift changes if Matrix has approved the frequency of the shift changes and that the possible shift changes would be from Plaintiff's normal shift of 8:00 a.m. to 4:30 p.m. to either 7:00 a.m. to 3:30 p.m. or 7:30 a.m. to 4:00 p.m.

Plaintiff testified that she was denied shift changes in excess of two for the month of November 2012. She further testified that, without the shift changes, she had to make appointments

over her lunch break, which meant that she would not eat lunch and that she had to "hurry over to the Physical Therapy Department, get undressed, get [her] treatment, get dressed and hurry back." (Pl.'s Exh. C, 85:5-7, ECF No. 44-5). Plaintiff testified that she believed she was discriminated against by not being given the additional shift changes.

Plaintiff took eight hours of leave under the FMLA on December 20, 2012. Jaime signed Plaintiff's FMLA leave form for these hours on December 24, 2012.

On December 27, 2012, Jaime sent an email to Smith asking how to calculate if an employee has exceeded the allowed number of hours under the FMLA. Jaime included a list of "hours since the first of year," which gave a total of 168 hours. (Pl.'s Exh. P, ECF No. 44-16). Smith asked a Matrix representative to get a more detailed certification of Plaintiff's FMLA leave, saying that the then-current certification was too vague. Smith also asked if the 168 hours listed by Jaime were approved. The representative emailed Dr. Noonan and asked for an update on Plaintiff's medical condition, specifically requesting the doctor to "be sure to complete question 7 for frequency and duration." (Pl's Exh. Q, at 1, ECF No. 44-17). The representative responded to Smith and indicated that, out of the 168 hours, only 82.5 had been reported as FMLA hours.

Plaintiff testified that she did not receive papers for FMLA certification regarding the recertification requests of December 2012. Plaintiff emailed Jaime on January 4, 2013, to question why Defendant was asking for recertification of Plaintiff's FMLA approval.

Plaintiff testified that, during a January 2013 telephone call with Smith, Plaintiff was demanding, questioned things, and probably raised her voice. Plaintiff further testified that, in this conversation, she was challenging FMLA violations—specifically, Plaintiff believed that Defendant had violated her rights under the FMLA by not using its usual certification process, which involved

sending Plaintiff the certification papers in the mail and not by directly contacting her physician. Plaintiff also testified that she had asked Smith to correspond in writing and not via telephone because Plaintiff did not want her coworkers to hear the conversation. Plaintiff testified that at least four people overheard her conversation with Smith.

Plaintiff's 2011 Performance Appraisal contains comments, including "Sandra is very good about sharing information with her team on processes that work for her as she works her accounts. She willing[ly] helps anyone and will offer assistance if she sees someone in need. Does not always project a positive attitude"; "Is not always sensitive to how she says things which may offend others"; and "Occasionally she needs to be reminded to watch her tone of voice when speaking with others. She has a tendency to come across as rude or disrespectful. She needs to voice her displeasure in private and not in a group setting." (Pl.'s Exh. G, 2-4, ECF No. 44-8). Under the section on Model of Care and Conduct, she received a rating of 3.1 out of 5, which is considered to be meeting standards.

Plaintiff's 2012 Performance Appraisal, received by Plaintiff on December 27, 2012, contains comments, including "Sandra needs to promote cooperative behavior and team efforts. She needs to recognize the many benefits of spirited teamwork. We have addressed this [with] Sandra on a number of occasions"; "Sandra respects the individuality of patients and peers"; "She needs to demonstrate proper telephone technics [sic] and edicate [sic]. This has been brought to her attention on different occasions throughout the year"; "It has been brought to Sandra['s] attention on a number of occasions with regards to eye contact/smile and acknowledging her co-workers. She has improved in the last couple months but throughout the year we received and addressed this [with] her several times;" "Sandra will assist anyone to the best of her abilities. She will find someone that can assist

if she is unable to"; and "Sandra analyzes problematic accounts and takes actions that result[ ] in a positive outcome. She works hard at identifying Saves and converts them into payment. I would like her to continue to identify these account[s] as well as meet her productivity/Quality/A/R goals." (Pl.'s Exh. N, 2-4, 14, ECF No. 44-14). Plaintiff received a Model of Care and Conduct Sub-Total score of 3.8 out of 5, an Essential Functions Sub-Total score of 2.6 out of 5, and an Overall Score of 2.6 out of 5. The Appraisal also notes that Plaintiff averaged 62 accounts per day.

The 2011 Performance Appraisal used a different scale under the Model of Care and Conduct than the scale used for that section of the 2012 Performance Appraisal.

Defendant issued two Corrective Action Notices to Plaintiff, one in December 2012, which resulted in a one-day suspension, and one in January 2013, which resulted in termination of her employment. Jaime signed both Notices as the approving authority. Plaintiff testified that she received the first Notice on December 27, 2012. The Notice alleged events occurring on December 14, 2012. Plaintiff testified that she served a one-day suspension on this Notice and that she did not file a grievance in response to this Notice. Plaintiff testified that she received the second Notice on January 24, 2013. The Notice alleges events occurring on January 11 and 14, 2013. Jaime testified that Plaintiff was terminated for the behavior described in the January 24, 2013 Notice. Plaintiff testified that she had filed a grievance in response to a Corrective Action Notice issued prior to the events underpinning this cause of action. Jaime testified that the previous Notice was rescinded in response to her grievance.

The December 2012 Corrective Action Notice states that Plaintiff's conduct on December 14, 2012, was not in keeping with Defendant's practice and policies. It further indicates that the specific violation was discourteous or rude treatment of employees or medical staff. The basis given

for this violation was several co-workers' reports of concerns as to how Plaintiff communicated to patients. Plaintiff responded in writing on the Notice that she disagreed with the Notice and signed the Notice to verify her receipt of it.

The January 2013 Corrective Action Notice states that Plaintiff's conduct on January 11 and 14, 2013, was not in keeping with Defendant's practice and policies. It further indicates that the specific violation was discourteous or rude treatment. The basis given for this violation was reports from an HR Benefits Manager and Plaintiff's coworkers of unprofessional, argumentative, and demanding communication to the HR Benefits Manager regarding Plaintiff's questions about the FMLA.

Plaintiff testified that Melissa Vasquez is "Latin" and that Vasquez engaged in the following behavior and received no disciplinary action: yelled at Plaintiff in 2012, wore a nose ring in violation of company policy, had an exposed tattoo in violation of company policy, wore dresses or skirts that violated the dress code, put on make-up at her desk, and watched TV on her cell phone.

Jaime testified that Margie Salinas was given a Corrective Action Notice in July 2010. The Notice indicates that a suspension would be imposed on Salinas. However, the Notice was rescinded. Jaime further testified that Salinas filed a grievance in response to her Corrective Action Notice, and that the grievance is what led to the Notice being rescinded.

## ANALYSIS

### A. Evidentiary Disputes

In Plaintiff's Statement of Genuine Disputes (and Plaintiff's Additional Material Facts), Plaintiff objects to evidence that Defendant has included in support of its Motion for Summary Judgment. The objections should have been brought in a separate motion pursuant to Northern

District of Indiana Local Rule 56-1(e). However, noting that Defendant has responded to these objections, the Court will address these objections. Plaintiff argues that Plaintiff's Performance Appraisals from 2010, 2011, and 2012 and the Corrective Action Notices that Plaintiff received in December 2012 and January 2013 are inadmissible.

Plaintiff argues that her 2010 and 2011 Performance Appraisals are inadmissible as evidence because they are irrelevant and contain hearsay. Plaintiff argues that her 2012 Performance Appraisal is inadmissible because it contains hearsay. Defendant contends that the Performance Appraisals are relevant and that the 2011 and 2012 Performance Appraisals are admissible under the business record exception to the rule against hearsay. Plaintiff argues that the December 2012 Corrective Action Notice and the January 2013 Corrective Action Notice are not supported and are hearsay. Defendant asserts that they are not.

Despite her objection to Defendant's use of the documents, Plaintiff has also submitted the 2011 and 2012 Performance Appraisals and the December 2012 and January 2013 Corrective Action Notices as evidence. Plaintiff, in her response to the instant motion, refers to her 2011 and 2012 Performance Appraisals, comparing her 2012 scores to her 2011 scores and mentioning that she received positive comments from her rater and manager. Plaintiff's objection that this evidence is irrelevant is undercut by her own use of these documents.

Further, the proper evidentiary objection at the summary judgment stage is "that the material cited to support or dispute a fact *cannot* be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2) (emphasis added). Plaintiff only objects that the appraisals are currently not admissible. That objection is not proper at the summary judgment stage and, therefore, Plaintiff's objections are overruled.

11

**B. FMLA Claims**

*1.    Interference*

The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" an employee's rights given by the FMLA. 29 U.S.C. § 2615(a)(1). "Interfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. § 825.220(b).

To survive summary judgment on a claim of interference under the FMLA, a plaintiff must present evidence to create a genuine issue of material fact that (1) she was eligible for the FMLA's protections; (2) her employer was covered by the FMLA; (3) she was entitled to take FMLA leave; (4) she provided sufficient notice of intent to take leave; and (5) her employer denied or interfered with FMLA benefits to which she was entitled. *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 816 (7th Cir. 2015) (quoting *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 635-36 (7th Cir. 2009)). Defendant does not challenge that Plaintiff meets the first four elements.

Plaintiff claims that Defendant interfered with her right to FMLA leave by not excluding leave under the FMLA from time worked when calculating whether Plaintiff met her quota and by initiating a recertification process that violated provisions of the FMLA.

Plaintiff also argues that her termination interfered with her use of her FMLA rights. However, Plaintiff's argument in support is that she was terminated "related to her continual issues with FMLA . . . and a final conversation . . . questioning her FMLA rights." (Pl.'s Resp., 9, ECF No. 44). Plaintiff does not argue or present evidence that her termination was to prevent or discourage her from exercising her rights under the FLMA or otherwise prevent her from exercising a

substantive right granted by the FMLA. This argument is not properly brought under a theory of FMLA interference, but the Court will address it under the FMLA retaliation analysis below.

Additionally, Plaintiff argues that Defendant's denial of her requests for more than two shift changes per month interfered with her FMLA rights. However, Plaintiff has failed to present evidence that these requests are requests for unpaid leave under the FMLA. Defendant asserts that it never denied FMLA benefits to Plaintiff and never denied Plaintiff the ability to attend her appointments. From the evidence, Plaintiff's requests for "shift changes" appear to be requests to switch the hours of her shift so that she could work her full shift and also attend medical appointments. The FMLA gives a substantive right to leave, but Plaintiff's request for a shift change is not a request for time off of work. Further, Plaintiff does not argue that she requested FMLA leave and was denied that leave or identified any other FMLA benefit to which she was entitled that was denied regarding these shift changes. Plaintiff has not identified a legal basis that would allow Plaintiff to bring this claim under the FMLA. *See Tarpley v. City Colls. of Chicago*, 87 F. Supp. 3d 908, 915-16 (N.D. Ill. 2015) (dismissing a claim brought under the FMLA for failure to accommodate because the court was unable to locate a right of action for that claim). Because failure to accommodate is a claim recognized under the ADA, the Court will address the request for shift changes under the ADA analysis below.

a.      Exclusion of Time from Quota

Plaintiff argues that absences due to FMLA leave were not subtracted from hours worked when determining whether Plaintiff met her quota, and that this failure to subtract interfered with her FMLA rights. A jury can find the grant of an FMLA leave request to be illusory if the employee is held to the same performance or quota standards as if the employee were working her full hours.

*Pagel v. TIN Inc.*, 695 F.3d 622, 629 (7th Cir. 2012); *Lewis v. School Dist. #70*, 523 F.3d 730, 742-43 (7th Cir. 2008). Though *Pagel* and *Lewis* involved terminations resulting from performance or quota issues, an illusory grant of FMLA leave is a denial of FMLA leave, and adverse employment action is not an element of an interference claim under the FMLA. *See Preddie*, 799 F.3d at 816. Plaintiff came close to, but failed to meet, the account quota in 2012.

Jaime testified that the required 65 accounts per day quota was based on hours worked and that anything that took an employee away from performing her job, such as paid time off or being in a meeting, was considered downtime. Jaime later testified that "the calculation is you subtract the non-productivity hours . . . you're coming up with that average." (Pl.'s Exh. A, 145:19-21). Jaime also testified that it would be possible, if Plaintiff were taking too much time off, for her productivity numbers, as recorded on a spreadsheet, to be affected. Plaintiff, in her deposition, testified that she had instances of FMLA downtime that were not noted on her quota sheets and that "there is no such calculation to calculate your quota plus your downtime. (Pl's Exh. C, 85:12-13). Neither side has pointed to actual data, spreadsheets, or calculations in arguing this matter. There is a genuine issue of material fact regarding whether Defendant included FMLA leave in calculating Plaintiff's daily account quota. A reasonable jury could find that Defendant failed to adjust its performance standards and that the FMLA leave it granted to Plaintiff was illusory. Defendant is not entitled to summary judgment as to Plaintiff's claim of FMLA interference as to inclusion of FMLA leave in calculating Plaintiff's daily account quota.

b.      Recertification

Plaintiff contends that Defendant erred in requesting recertification[2] of her FMLA leave from her physicians directly and, relatedly, for not giving Plaintiff notice of the recertification request and of FMLA rights and responsibilities. The FMLA does not provide an independent claim for relief based on violation of its recertification procedure unless that violation interfered with or restrained the employee's FMLA rights. *Goelzer v. Sheboygan Cty., Wis.*, 604 F.3d 987, 996 (7th Cir. 2010). To prevail in an FMLA interference action, "an employee must prove, as a threshold matter, that the employer violated [29 U.S.C.] § 2615 by interfering with, restraining, or denying his or her exercise of FMLA rights." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 82 (2002); *see also* 29 U.S.C. 2617. Further, once interference has been shown, "[29 U.S.C.] § 2617 provides no relief unless the employee has been prejudiced by the violation." *Id.*

Plaintiff asserts that, in seeking recertification, Defendant "violated the FMLA and interfered with [Plaintiff's] FMLA rights," but Plaintiff presents no evidence of the recertification procedure leading to a denial of her benefits or of the recertification procedure discouraging her from using FMLA leave to which she was entitled. Plaintiff testified that, when her FMLA certification was under review, she "didn't have to take any doctors' appointments during that time." (Pl's Exh. C, 118:23-24).

Further, though Plaintiff argues that her leave was approved through June 6, 2013, and that recertification was only to be requested on an annual basis, that is a matter of Defendant's policy. FMLA regulations permit employers "to request a recertification of a medical condition every six

---

[2]Though it is not clear form the evidence of record whether Defendant sought recertification of Plaintiff's FMLA status under 29 C.F.R. § 825.308 or sought clarification of Plaintiff's existing certification under 29 C.F.R. § 825.307, both parties refer to Defendant's request as one for recertification, so the Court adopts that premise for the purpose of this motion.

months in connection with an absence by the employee." 29 C.F.R. § 825.308. Plaintiff's previous certification was approved June 7, 2012, so the timing of the recertification request on December 27, 2012 was not a violation of the FMLA. Consequently, Plaintiff would need to show that direct contact with her physician or failure to notify her of the recertification request or of FMLA rights and responsibilities in connection with the recertification request interfered with her FMLA entitlements, and she has not done so. Because Plaintiff has not presented evidence from which a reasonable jury could determine that Defendant interfered with her FMLA rights through seeking recertification of her FMLA leave or that Plaintiff was prejudiced by an FMLA violation, Defendant is entitled to summary judgment as to Plaintiff's claim of FMLA interference regarding the recertification process.

2.      *Retaliation*

Plaintiff claims that Defendant retaliated against her, in violation of the FMLA, by denying Plaintiff's requests for shift changes in retaliation for her requests for intermittent FMLA leave, and by disciplining Plaintiff by issuing two Corrective Action Notices to her.

The FMLA makes it unlawful to "discharge or in any other matter discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2); *see also* 29 C.F.R. § 825.220(a). In addition, an employer is prohibited from "discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights." 29 C.F.R. § 825.220(c). "In other words, the employer cannot use an employee's use of FMLA leave as a negative factor in promotion, termination, and other employment decisions." *James v. Hyatt Regency Chi.*, 707 F.3d 775, 781 (7th Cir. 2013).

To survive summary judgment on her FMLA retaliation claim, Plaintiff may use either the direct or indirect method of proof. *See Pagel*, 695 F.3d at 632 (citing *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004)); *see also Cracco*, 559 F.3d at 633; *King v. Preferred Tech. Grp.*, 166 F.3d 887, 891 (7th Cir. 1999). Proceeding under the direct method, Plaintiff must present evidence that, if believed, creates a genuine issue of material fact that (1) she engaged in a protected activity; (2) Defendant took an adverse employment action against her; and (3) there is a causal connection between Defendant's protected activity and Defendant's adverse employment action. *Cracco*, 559 F.3d at 633 (citing *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 850 (7th Cir. 2008)).

The causation standard for FMLA retaliation claims is unsettled, as the Seventh Circuit Court of Appeals has questioned, but not resolved, whether but-for causation should apply in light of Supreme Court precedent under other anti-retaliation statutes. *See Malin v. Hospira, Inc.*, 762 F.3d 552, 562 n.3 (7th Cir. 2014) ("Although Title VII retaliation claims were formerly evaluated using this same motivating factor test, the Supreme Court has recently interpreted Title VII's retaliation provision to require proof of but-for causation instead.") (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013) (Title VII); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009) (ADEA)). Because the outcome remains the same regardless of whether but-for causation or the previous "a substantial or motivating factor" is the proper standard and because the parties did not discuss the causation standard in light of *Malin*, the Court declines to resolve the issue. *See Goelzer*, 604 F.3d at 995 (stating the pre-*Nassar* and pre-*Gross* causation standard for FMLA retaliation).

Under the indirect method, Plaintiff must first establish a prima facie case of retaliation by showing that (1) she engaged in statutorily protected activity; (2) she was meeting Defendant's

17

legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Simpson v. Office of Chief Judge of Circuit Court of Will Cty.*, 559 F.3d 706, 718 (7th Cir. 2009); *Cracco*, 559 F.3d at 634-35. Summary judgment in favor of Defendant is appropriate if Plaintiff fails to establish any of the elements of the prima facie case. *Atanus v. Perry*, 520 F.3d 662, 673 (7th Cir. 2008). If Plaintiff establishes a prima facie case, then Defendant must provide a legitimate, non-retaliatory reason for the adverse action under the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973). *See Cracco*, 559 F.3d at 635. If Defendant meets its burden, Plaintiff must show that the reason is pretextual. *See Atanus*, 520 F.3d at 673.

a.     Denial of Shift Changes

First, Plaintiff argues that Defendant denied Plaintiff's requests for additional shift changes in retaliation for Plaintiff's use of intermittent leave under FMLA. To the extent the "intermittent leave under the FMLA" to which Plaintiff refers is a shift change, Plaintiff has not shown that the shift changes are leave protected under the FMLA as opposed to a change to the timing—but not the total hours—of her work shift. Denial of shift changes will be addressed under the ADA section below. Because there is evidence in the record that Plaintiff had used intermittent FMLA leave in the past, the Court proceeds to address the claim based on that use. Under the direct method, Plaintiff's use of FMLA leave is a protected activity, so the first prong is satisfied. For the second prong, Plaintiff asserts that her manager "refuse[d] to accommodate more than two shift changes per month to allow [Plaintiff's] physical therapy appointments," and the Court infers that Plaintiff is arguing that this is an adverse employment action. (Pl's Statement of Genuine Disputes, 11, ECF

No. 44-2). For the purpose of analysis of this prong, the Court assumes without deciding that refusal to accommodate the shift changes is an adverse employment action. Plaintiff testified at her deposition that she was only permitted two schedule changes per month. A jury could believe Plaintiff's testimony.

However, Plaintiff has not satisfied the third prong of the direct method. The third prong is a causal connection between the protected activity and the adverse employment action. The only evidence cited is a chain of emails and two pages of Plaintiff's deposition testimony.

In the email chain, Plaintiff's supervisor, Marilyn Soto, asked how to give Plaintiff shift changes in November 2012 in excess of the office policy of two. Human resources employee Kimberly Smith responded that Soto should give Plaintiff the shift changes. Plaintiff's manager, Yolanda Jaime, responded that she would like to tell Plaintiff appointments after two shift changes would need to be scheduled during Plaintiff's lunch or after the work day. Jaime further indicated that she did not want to make exceptions for any one employee because Jaime has had problems with this before and Plaintiff has "made a big issue of this." (Pl's Exh. II, at 2, ECF No. 44-33). Smith responded to Jaime, indicating that Jaime's suggested solution would potentially violate the FMLA. Soto indicated that she believes she should tell Plaintiff that Defendant will give shift changes if Matrix has approved the frequency of the shift changes and that the possible shift changes would be from Plaintiff's normal shift of 8:00 to 4:30 to either 7:00 to 3:30 or 7:30 to 4:00.

The email chain makes many references to the FMLA, including Plaintiff's status as an employee certified for FMLA leave. However, there is no mention of not giving shift changes because of this status or mention of her past use of intermittent FMLA. Soto's and Smith's emails show that they believe these shift changes should be given. Though Jaime appears reluctant to grant

19

shift changes to Plaintiff, her reasons as stated in her email are that she wants to avoid making exceptions and that other employees have been able to either use paid time off or their lunch hours for physical therapy.

Plaintiff, in the cited deposition testimony, testified that she believed she was discriminated against by not being given the additional shift changes. Plaintiff does not explicitly give the characteristic she believes Defendant discriminated against her for, but she does refer to discrimination against long-term disabilities. There is no reasonable inference in the evidence cited that the refusal to give additional shift changes was due to past use of intermittent FMLA leave.

A reasonable jury could not decide, based on the evidence cited, that Plaintiff's past use of intermittent FMLA leave has a causal connection to the denial of shift changes in excess of two per month.

Under the indirect method, Plaintiff has presented no evidence of similarly situated employees who were given additional shift changes. Plaintiff has failed to make a prima facie case under the indirect method. Defendant is entitled to summary judgment as to Plaintiff's claim of FMLA retaliation for use of intermittent FMLA leave through denial of shift changes.

> b.     December 2012 Corrective Action Notice

Plaintiff argues that Defendant retaliated against her in violation of the FMLA by issuing a Corrective Action Notice to her in December 2012, which resulted in a one-day suspension. Plaintiff asserts that "FMLA was a factor" in this Notice. Plaintiff has not explicitly stated what protected activity was a factor. However, Plaintiff argues that, when she complained and questioned her FMLA hours and Defendant's recertification procedure, she was given a Corrective Action Notice. Plaintiff falls short of alleging that the Notice is in retaliation for use of FMLA leave. The Court

construes Plaintiff's argument to be that this Notice was issued in retaliation for Plaintiff's challenge to FMLA violations. Plaintiff also asserts that she complained regarding her request for additional shift changes, but the shift changes are not protected under the FMLA, and, further, Plaintiff has provided no evidence of her complaints regarding shift changes. The evidence, viewed in the light most favorable to Plaintiff, is as follows.

On December 20, 2012, Plaintiff took eight hours of FMLA leave. Jaime signed Plaintiff's FMLA leave form for these hours on December 24, 2012. Plaintiff received the Corrective Action Notice on December 27, 2012, and the Notice is for Plaintiff's alleged behavior on December 14, 2012. Also on December 27, 2012, Jaime sent an email asking how to calculate if an employee has exceeded the allowed number of hours under the FMLA and included a list of "hours since the first of year," which gave a total of 168 hours. Smith asked a Matrix representative to get a more detailed certification of Plaintiff's FMLA leave, saying that the then-current certification was too vague. Smith also asked if the 168 hours listed by Jaime were approved. The representative emailed Dr. Noonan and asked for an update on Plaintiff's medical condition, specifically requesting the doctor to "be sure to complete question 7 for frequency and duration." (Pl's Exh. Q, at 1, ECF No. 44-17). The representative responded to Smith and indicated that, out of the 168 hours, only 82.5 had been reported as FMLA hours. On December 27, 2012, in addition to the Corrective Action Notice, Plaintiff also received her 2012 performance evaluation.

Plaintiff emailed Jaime on January 4, 2013, to question why Defendant was asking for recertification of Plaintiff's FMLA approval.

Looking at this evidence all together, Plaintiff has not presented evidence that she made FMLA questions or complaints to Defendant prior to January 4, 2013, which is after Defendant

issued the December 27, 2012 Corrective Action Notice. Any complaints Plaintiff may have made regarding shift changes are not protected under the FMLA because shift changes are not an FMLA entitlement.

In the same vein, Plaintiff has failed to state a prima facie case under the indirect method because the alleged statutorily protected activities at issue occurred after the adverse employment action.

### c.       January 2013 Corrective Action Notice

Plaintiff argues that the January 2013 Corrective Action Notice, which indicated that her employment with Defendant was terminated, was given to her in retaliation for her complaints and questions regarding Defendant's FMLA practices. The parties agree that Plaintiff's termination was an adverse employment action.

Plaintiff must present evidence that she engaged in protected activity. Plaintiff admits that, during a telephone call with Smith, Plaintiff was demanding, questioned things, and probably raised her voice. Defendant cites this behavior for its decision to take corrective action. Plaintiff testified that, in this conversation, she was challenging FMLA violations—specifically, Plaintiff believed that Defendant had violated her rights under the FMLA by not using its usual certification process, which involved sending Plaintiff the certification papers in the mail, not by contacting her physician. Plaintiff is correct that an "employer must give notice of a requirement for certification each time a certification is required." 29 C.F.R. § 825.305(a). Plaintiff testified that she did not receive the paperwork for FMLA certification for the December 2012 certification request. Plaintiff has met her burden to show that she engaged in protected activity.

Plaintiff must also present evidence from which a reasonable jury could determine that there was a causal connection between Plaintiff's protected activity and her termination. The evidence shows that Jaime, Plaintiff's manager, wanted to restrict Plaintiff to no more than two shift changes per month, even after a human resources person opined that, due to Plaintiff's FMLA status, she should be accommodated with additional shift changes.[3] Jaime signed as the approving authority for the January 2013 Corrective Action Notice. The phone call wherein Plaintiff allegedly engaged in the behavior in question was about Plaintiff's FMLA leave and Defendant's process in certifying Plaintiff for this leave. A week earlier, on January 4, 2013, Plaintiff sent an email message asking for an explanation of Defendant's decision to request more information on Plaintiff's certification.

"Under ordinary circumstances, close temporal proximity provides evidence of causation and may permit a plaintiff to survive summary judgment *provided that* there is other evidence that supports the inference of a causal link." *Magnus v. St. Mark United Methodist Church*, 688 F.3d 331, 338 (quoting *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 390 (7th Cir. 2012). Here, Plaintiff has presented evidence that, when viewed favorably, shows her manager's indifference to Plaintiff's FMLA rights. Further evidence indicates that Plaintiff tried to oppose a violation of her FMLA rights in both an email message and phone conversation, and Plaintiff was terminated as a result of the very conversation in which she opposed Defendant's practices. Under the direct method, Plaintiff has presented enough evidence to survive summary judgment on this claim.

Though Defendant argues that it had a legitimate reason to terminate Plaintiff due to her alleged pattern of rude and discourteous behavior, Plaintiff's claim withstands summary judgment

---

[3]As noted earlier, Plaintiff has not shown the shift changes to be a form of leave protected by the FMLA. However, Jaime's expressed desire to restrict Plaintiff's shift changes despite being told to grant the shift changes as an accommodation is evidence that a reasonable jury could use to infer that Jaime did not respect Plaintiff's FMLA rights.

under the direct method. The Performance Appraisals and Corrective Action Notices do present evidence of behavioral issues, but Plaintiff's protected activity need not be the only factor that led to her termination, provided that the protected activity meets the required causation standard. The facts as presented are enough to survive summary judgment even if the more stringent but-for causation is the appropriate standard. A reasonable jury could determine that, even if Plaintiff's behavior was a factor in Defendant's decision to discipline Plaintiff, the Defendant would not have taken the disciplinary measures it did had Plaintiff not been challenging Defendant's FMLA practices.

3.      *Disclosure of Medical Information*

Plaintiff's Complaint alleges that she was made to talk about her FMLA issues where her coworkers could hear. Plaintiff indicates in her response brief that the FMLA prohibits disclosure of confidential health information, *see* 29 C.F.R. § 825.500(g), and that evidence shows that the phone call regarding Plaintiff's FMLA, a conversation which Plaintiff had indicated she wished to have in writing, was loud enough for Plaintiff's coworkers to overhear confidential health information. Defendant does not address Plaintiff's allegations of forced discussion of her FMLA issues contained in her complaint or Plaintiff's argument that Defendant violated the FMLA on this ground. Because Defendant has made no argument that summary judgment is warranted on this claim, it remains pending.

## C. Title VII Claim

Plaintiff alleges that Defendant discriminated against her through disparate treatment of Plaintiff based on her race, white. Title VII of the Civil Rights Act of 1964 provides, in part, that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise

to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The legal standard for a Title VII case "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters. Inc.*, — F.3d —, 2016 WL 4411434, at *4 (7th Cir. Aug. 19, 2016). In deciding motions for summary judgment in Title VII discrimination cases, courts consider all of the relevant evidence presented as a whole and do not separate direct evidence from indirect evidence. *Id.* at *4.

One way to survive summary judgment on a Title VII claim is to proceed under the burden-shifting method established by the United States Supreme Court in *McDonnell Douglas*. Under this method, a plaintiff must first establish a prima facie case of discrimination by providing evidence indicating that: (1) she is a member of a protected class; (2) she was meeting her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees not in her protected class were treated more favorably. *Naik v. Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 599-600 (7th Cir. 2010) (citing *Hilderbrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1030 (7th Cir. 2003)). The Seventh Circuit Court of Appeal, however, has "modified the test to apply to situations where members of majority groups believe they were subject to employment discrimination." *Phelan v. City of Chicago*, 347 F.3d 679, 684 (7th Cir. 2003) (citation omitted). Thus, in such cases of "reverse discrimination," the first element of the prima facie case cannot be used and, instead, a plaintiff must show "background circumstances" sufficient to demonstrate that the employer has "reason or inclination to discriminate invidiously against whites" or evidence that "there is something 'fishy' about the facts at hand." *Id.* (citation omitted).

25

If the plaintiff meets her burden of establishing a prima facie case, a rebuttable presumption of discrimination arises, and the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the challenged action. *McDonnell Douglas Corp.*, 411 U.S. at 802; *accord Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006). If the defendant provides a legitimate, nondiscriminatory reason for its actions, the burden shifts back to the plaintiff to offer evidence indicating that "the proffered reason is actually a pretext for illegal discrimination." *Grigsby v. LaHood*, 628 F.3d 354, 359 (7th Cir. 2010) (citing *Adelman-Reyes v. Saint Xavier Univ.*, 500 F.3d 662, 666 (7th Cir. 2007)).

In other cases, this burden-shifting framework is not needed in order for the plaintiff to "demonstrate a triable issue as to whether discrimination motivated the adverse employment action of which [she] complaints." *Davis v. Time Warner Cable of Se. Wis., LP*, 651 F.3d 664, 672 (7th Cir. 2011) (footnote omitted) (citing *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1114 (7th Cir. 2009)).

In support of her Title VII claim, Plaintiff identifies three co-workers who Plaintiff contends received more favorable treatment than Plaintiff did: Margie Salinas, Melissa Vasquez, and Diane Kyle. Plaintiff has neither identified any evidence of Kyle's race nor explicitly stated what Kyle's race is, so Defendant's treatment of Kyle is irrelevant to this claim.[4] Further, though Plaintiff cites her Exhibit A at page 10 in support of her assertion that Salinas and Vasquez are Hispanic or Latina, the evidence cited does not support this assertion, though it does identify Yolanda Jaime, Plaintiff's

---

[4]Plaintiff references "Latino and black employees" receiving better treatment than Plaintiff, but, with nothing more, the Court is unwilling to make assumptions about Kyle's race, and, at the summary judgment stage, Plaintiff must present evidence.

supervisor, as Puerto Rican. Defendant has identified testimony of Plaintiff asserting that Vasquez is "Latin."

Even if Plaintiff had produced evidence to show that Salinas is Hispanic or Latina, Plaintiff has still not shown enough similarity between Salina's and Plaintiff's circumstances. Plaintiff argues that Salinas received better treatment because Salinas's two-day suspension for her conduct was not enforced. However, Jaime testified at her deposition that Salinas's Corrective Action Notice was rescinded because Salinas filed a grievance. Plaintiff testified at her deposition that she did not file a grievance in response to the December 27, 2012 Corrective Action Notice. Plaintiff also testified that she had filed a grievance in response to a previous Corrective Action Notice, and Jaime testified that the previous Notice was rescinded in response to her grievance.

Regarding Vasquez, Plaintiff cites to her own deposition testimony at page 47. Though Vasquez is not discussed on that page, she is discussed shortly thereafter on pages 49 to 55. Plaintiff testified that Vasquez engaged in the following behavior and received no disciplinary action: yelled at Plaintiff in 2012, wore a nose ring in violation of company policy, had an exposed tattoo in violation of company policy, wore dresses or skirts that violated the dress code, put on make-up at her desk, and watched TV on her cell phone. Assuming for the sake of the instant motion that Vasquez engaged in all of this behavior, there is not enough evidence here from which a reasonable juror could conclude, outside of the *McDonall Douglas* framework, that Plaintiff's race led to her discharge. Most of the infractions cited are significantly different than the rude and discourteous behavior for which Plaintiff was disciplined. This leaves one instance of yelling at Plaintiff for which Vasquez was not disciplined, and this is too little from which to infer that Defendant's disciplinary actions against Plaintiff were racially motivated under the direct method.

27

Next, within the *McDonall Douglas* framework, Plaintiff first has the burden to make a prima facie case. Part of the prima facie case for a claim of reverse race discrimination is to show background circumstances sufficient to demonstrate that the employer has reason or inclination to discriminate invidiously against whites or evidence that there is something fishy about the facts at hand. Plaintiff has not identified any such evidence or made any argument on this point. For example, Plaintiff has not argued that she was replaced by a non-White employee, nor has she argued that Defendant has a history of taking harsher disciplinary measures against White employees or of giving preferential treatment to non-White employees. *See Hague v. Thompson Distribution Co.*, 436 F.3d 816, 822 (7th Cir. 2006) (finding suspicious background circumstances where five White employees were fired and replaced by Black employees); *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 457 (7th Cir. 1999) (finding suspicious background circumstances in a reverse gender discrimination case where nearly all promotions in a seven-year period went to women). Plaintiff has identified that Jaime, her manager, is Puerto Rican. The first prong of the prima facie case is not met. Therefore, Defendant is entitled to summary judgment on the Title VII claim.

Defendant has also argued that Plaintiff has failed to state a claim upon which relief can be granted. Federal Rule of Civil Procedure 12 provides that this defense may be brought after a responsive pleading is served by raising it in a motion for judgment on the pleadings or at trial. Fed. R. Civ. P. 12(h)(2). Rule 12 does not contemplate raising the defense in a summary judgment motion under Rule 56. Further, because Defendant is entitled to summary judgment on the Title VII claim, analysis of the Title VII claim under this defense is unnecessary.

### D. ADA Claims

Plaintiff asserts that Defendant discriminated against her because of her disability on a theory of disparate treatment and that Defendant violated the ADA's confidentiality provision. Further, Plaintiff's contention that she was denied shift changes as an accommodation of her medical conditions is a claim recognized under the ADA.

1.     *Disparate Treatment*

A claim of disparate treatment under the ADA is similar to a Title VII disparate treatment claim. The ADA provides that it is unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). As with Title VII, the Court does not separate "direct evidence" from "indirect evidence"; rather, the Court considers all evidence as a whole. *See Ortiz*, — F.3d. —, 2016 WL 4411434, at *9; *see also Edwards v. Ill. Dep't of Fin.*, 2016 WL 5233460, at *9 (N.D. Ill. Sept. 22, 2016) (applying *Ortiz* to an ADA claim). If the evidence would permit a reasonable jury to conclude that a plaintiff's protected characteristic caused the adverse employment action, then summary judgment for the defendant is inappropriate. *Ortiz*, — F.3d. —, 2016 WL 4411434, at *9.

A plaintiff can rely on either the direct or the indirect method of proof to survive a summary judgment motion. *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 683 (7th Cir. 2014). Plaintiff, in her response to the instant motion, argues that her claim survives summary judgment under the indirect method, and, in her surreply, also argues that her claim survives under the direct method. Under the direct method, a plaintiff must show (1) that the plaintiff is disabled under the ADA, (2) that the

plaintiff is qualified to perform the essential functions of her job with or without accommodation, and (3) that the plaintiff suffered an adverse employment action because of her disability. *Id.* (citing *Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1127 (7th Cir. 2006)). The third prong of the test requires Plaintiff to show that her disability was a but-for cause of her termination. *Hillmann v. City of Chicago*, — F.3d —, 2016 WL 4437609, at *6 (7th Cir. 2016). Defendant argues that Plaintiff's claim fails under prongs one and three of the direct method. Defendant does not assert that the Plaintiff's claim fails under prong two.

Defendant contests the ADA's applicability to Plaintiff, arguing that Plaintiff does not have a disability as defined by the ADA. An individual has a disability under the ADA if she has a physical or mental impairment that substantially limits one or more major life activities, a record of such an impairment, or is regarded as having such an impairment. 42 U.S.C. § 12102(1). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A); 29 C.F.R. § 1630.2(I). The term "substantially limits" is to "be construed broadly in favor of expansive coverage" and "is not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(I). The impairment need not prevent or even significantly restrict someone from performing a major life activity in order to be considered substantially limiting. *See* 29 C.F.R. § 1630.2(j)(1)(ii). Defendant argues that Plaintiff's limitations are not substantial when compared to the general public.

Plaintiff testified as follows. Her scoliosis causes pain, affects her sleeping habits, and, at times, makes it more difficult for her to take care of herself, shower, and dress herself. It also causes occasional arm numbness. Plaintiff starts having pain after driving a long distance. Walking is

sometimes painful, but she is able to walk for approximately an hour, though foot problems also cause pain. Standing for too long is also painful. Plaintiff testified that her arthritis affects her daily activities in the same ways as her scoliosis. Plaintiff also testified that she has a heart blockage and is fully dependent on her pacemaker.

In light of this evidence, and the mandate to construe the term "substantially limits" broadly in favor of expansive coverage, the Court cannot say, at the summary judgment stage, that Plaintiff is not disabled under the ADA.

Defendant asserts that Plaintiff has no evidence that her discipline was the result of anything other than rude and discourteous behavior. Defendant points to Plaintiff's Performance Appraisals and Corrective Action Notices in support, saying that these documents indicate a pattern of unacceptable behavior. Plaintiff also points to her Performance Appraisals, saying that they indicate that she was meeting the minimum standards, and, further, Plaintiff notes that she was not given a Corrective Action Notice based on her 2012 Appraisal. Plaintiff also argues that some of her scores may be lower due to Defendant's failure to exclude FMLA hours when calculating her account quota. Other evidence shows that Jaime, Plaintiff's manager, wanted to restrict Plaintiff to no more than two shift changes per month, even after a human resources employee opined that Plaintiff should be accommodated with additional shift changes.

 Plaintiff received the first Corrective Action Notice on December 27, 2012, and the Notice is for Plaintiff's alleged behavior on December 14, 2012. Also on December 27, 2012, Yolanda Jaime sent an email asking how to calculate if an employee has exceeded the allowed number of hours under the FMLA. Jaime included a list of "hours since the first of year," which gave a total of 168 hours, though a Matrix employee later indicated that only 82.5 FMLA hours had been used

31

that year. Kimberly Smith asked a Matrix representative to get a more detailed certification of Plaintiff's FMLA leave, saying that the then-current certification was too vague. Smith also asked if the 168 hours listed by Jaime were approved. Though this conversation explicitly references only the FMLA and not the ADA, Plaintiff's FMLA certification is tied to her disability under the ADA. Likewise, as discussed above, the conversation that led to Plaintiff's second Corrective Action Notice was about Plaintiff's rights under the FMLA, which is tied to Plaintiff's disability.

To sum up, Plaintiff has presented evidence that Jaime was reluctant to provide Plaintiff with accommodation of her disability. Further evidence shows that communication about Plaintiff's FMLA leave—which, by inference, concerns her disability—was exchanged by Jaime and others on the same day that Jaime issued the December 27, 2012 Corrective Action Notice for events occurring almost two weeks prior. The Performance Appraisals give a mixed review of Plaintiff's areas of strength and areas for improvement. Finally, the conversation that led to the January 2013 Corrective Action Notice and Plaintiff's termination was about Plaintiff's concerns regarding her FMLA leave.

A reasonable jury could determine, based on the above evidence, that, but for Plaintiff's disability, Defendant would not have issued the Corrective Action Notices. The Court denies Defendant's request for summary judgment on this claim.

2.    *Failure to Accommodate*

To survive summary judgment on a failure to accommodate claim under the ADA, a plaintiff must point to evidence that, if believed by the factfinder, would show that (1) she is a qualified individual with a disability, (2) her employer was aware of the disability, and (3) her employer failed to reasonably accommodate that disability. *Reeves ex rel. Reeves v. Jewel Food Stores, Inc.*, 759

F.3d 698, 701 (7th Cir. 2014) (citing *Ekstrand v. Sch. Dist. of Somerset*, 583 F.3d 972, 975 (7th Cir. 2009)).

As addressed above, the Court cannot say, for the purposes of this motion, that the Plaintiff does not have a disability. The first prong of the direct method is satisfied. Defendant does not argue that it was unaware of Plaintiff's disabilities, and Defendant's awareness is supported by evidence that Defendant approved FMLA leave for Plaintiff's heart blockage and also accommodated Plaintiff's scoliosis and arthritis with a different chair and headphones. The parties are in dispute over whether Plaintiff has met the third prong of the direct method.

The dispute centers around physical therapy appointments in November 2012. Defendant argues that it did not prevent Plaintiff from attending these appointments, and Plaintiff argues that she should have been granted additional shift changes as a reasonable accommodation of her disability. Plaintiff further asserts that Defendant failed to engage in the interactive process to determine what reasonable accommodation would be. "[W]hile an employer's failure to engage in the interactive process alone is not an independent basis for liability, it is actionable if it prevents identification of an appropriate accommodation for a qualified individual." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1062 (7th Cir. 2014) (quotation marks omitted) (quoting *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1039 (7th Cir 2013).

The evidence shows that Defendant's Central Business Office allowed its employees up to two shift changes per month and that Plaintiff sought shift changes in excess of two in order to attend physical therapy appointments. Plaintiff worked a shift of 8:00 a.m. to 4:30 p.m. An email sent by Soto suggests that shift changes to either 7:00 a.m. to 3:30 p.m. or 7:30 a.m. to 4:00 p.m. were possible. Another email, this one authored by Smith, opined that Plaintiff should be given the

shift changes that she requested. Plaintiff testified that she was denied these shift changes. She further testified that, without the shift changes, she had to make appointments over her lunch break, which meant that she would not eat lunch and that she had to "hurry over to the Physical Therapy Department, get undressed, get [her] treatment, get dressed and hurry back." (Pl.'s Exh. C, 85:5-7, ECF No. 44-5). A reasonable jury could determine that the shift changes were a reasonable accommodation of Plaintiff's disability and that Defendant failed to make this accommodation. This claim survives summary judgment.

3.     *Disclosure of Medical Information*

Plaintiff's Complaint alleges that she was made to talk about her FMLA issues where her coworkers could hear. Plaintiff indicates in her response brief that the ADA prohibits disclosure of confidential health information, *see* 29 C.F.R. § 1630.14(c)(1), and that evidence shows that the phone call regarding Plaintiff's FMLA, a conversation which Plaintiff had indicated she wished to have in writing, was loud enough for Plaintiff's coworkers to overhear confidential health information. Defendant does not address Plaintiff's allegations of forced discussion of her FMLA issues contained in her complaint or Plaintiff's argument that Defendant violated the ADA on this ground. Because Defendant has made no argument that summary judgment is warranted on this claim, it remains pending.

**E. HIPAA Claim**

In Plaintiff's Complaint, she indicated that she felt that HIPAA had been violated when Smith called her instead of emailing her, which forced Plaintiff to "talk about [her] FMLA issues out loud where [her] co-workers could hear [her]." (Compl. Exh. 1, at 3, ECF No. 1-1). It is not clear from the Complaint whether Plaintiff intended to bring a claim under HIPAA, and the parties have

not briefed any HIPAA claim in their briefing on the instant motion for summary judgment. To the extent that Plaintiff did intend to bring such a claim, "HIPAA does not furnish a private right of action." *Carpenter v. Phillips*, 419 F. App'x 658, 659 (7th Cir. 2011). Therefore, the Court sua sponte dismisses any claim that Plaintiff has brought under HIPAA for failure to state a claim.

## CONCLUSION

Based on the foregoing, the Court hereby **GRANTS in part** and **DENIES in part** the Defendant's, the Methodist Hospitals, Inc., Motion for Summary Judgment [DE 36].

The motion is granted as to Plaintiff's (1) FMLA interference claim as to Defendant's recertification procedure, (2) FMLA retaliation claim for use of intermittent FMLA leave through denial of shift changes, (3) FMLA retaliation claim related to the December 27, 2012 Corrective Action Notice, and (4) Title VII claim.

The motion is denied as to Plaintiff's (1) FMLA interference claim as to inclusion of FMLA leave time in calculating quotas, (2) FMLA retaliation claim related to the January 2013 Corrective Action Notice, (3) ADA disparate treatment claim, and (4) ADA failure to accommodate claim.

Defendant did not address Plaintiff's claims of disclosure of confidential medical information in violation of the FMLA and ADA. These claims remain pending.

The Court sua sponte **DISMISSES** any claim brought under HIPAA in this cause of action.

So ORDERED this 30th day of September, 2016.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT